## AMERICAN ROLLING MILL CO. v. REPUBLIC STEEL CORPORATION.
### No. 9433.

Circuit Court of Appeals, Sixth Circuit.

Feb. 16, 1944.

Marston Allen, of Cincinnati, Ohio (Allen & Allen, of Cincinnati, Ohio, Parkinson & Lane and Wallace R. Lane, all of Chicago, Ill., and Marston Allen and Gibson Yungblut, both of Cincinnati, Ohio, on the brief), for appellant.

Drury W. Cooper, of New York City (Drury W. Cooper and E. D. Given, both of New York City, and Greer Marechal,

of Dayton, Ohio, on the brief), for appellee.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Claiming that The Republic Steel Corporation had infringed its process patent (Cushman Patent No. 1,735,732), for protecting metal culverts, and its patent (Cushman Patent No. 1,652,703) for a corrugated metal culvert, The American Rolling Mill Company brought proceedings for injunction and accounting. The district court held that the claims in issue, in view of the prior art, were invalid and lacked patentable invention.

Both parties are manufacturers of metal culverts, consisting of sheet metal cylinders, corrugated circumferentially and riveted together. Usually, the metal is coated with zinc. It appears that, in such culverts, water carrying abrasive material erodes the zinc coating. The exposed metal then rusts and the water seeping through holes, causes corrosion on the underside of the culvert and the washing away of supporting earth, with the effect that the culvert is undermined and weakened, and starts to collapse.

In arriving at what he claims was the remedy for erosion and corrosion of corrugated metal culverts, appellant's patentee based his solution on the theory that erosion inside such a culvert results from the circumstance that water, carrying abrasive substances, forms eddy currents, or causes a churning action, as a result of passing over the corrugations; that the particles of such abrasive substances in the water, glide along the hard surface of a metal culvert and, as a result of this gliding movement, they gouge and cut away the zinc coating, and erode the metal beneath. It is contended that appellant's patentee discovered that particles of abrasive material move in a different way over an asphalt surface; that, instead of gliding, such particles, because of the high coefficient of friction, roll over a surface of asphalt, and are thereby prevented from gouging the zinc coating, or eroding the metal of a culvert over which asphalt is applied at the place of wear.

Appellant's process patent, therefore, relates to the protection of sheet metal corrugated culverts from erosion, and consists of applying a protective layer, or layers, of adhesive, resilient bitumen, or asphalt, to the insides of the pipes, which permits of the inexpensive protection of the metal at the points of wear. The asphalt is sprayed, or flowed, into the culvert when it is lowered horizontally in a tank, in sufficient quantities and of such a consistency, as to result in its collecting in pools along the bottom center line of the culvert, of sufficient depth to level off the corrugations along the center line. Thereafter, it is held horizontally until the asphalt solidifies, thus forming a level floor at the bottom of the cylinder. The area of original contact of the asphalt is sufficient to leave the lower portion of the sides of the culvert, adjacent to the pools, covered with an adherent film from which the excess of asphalt flows to the center. As stated by the patentee, "The essential of the process is the fact that the pipe is corrugated circumferentially and is held horizontally while the bitumen solidifies. It cannot run out of the corrugations in such conditions."

The product patent is for a corrugated sheet metal culvert, having asphalt applied to the interior surface, filling the depressions of the corrugations, and covering the spaces between them, or submerging the corrugations, so as to present a surface or floor substantially free of depressions along the base. The asphalt also coats the sides of the inside of the culvert, adjacent to the floor, with a relatively thin adhesive covering.

Appellee introduced evidence of claimed prior use. It appears that in 1921, a particular corrugated metal culvert at Ventura, California, underwent a certain process of repair. The tops of the corrugations along the bottom of the culvert had been worn away by gravel and other substances coming through the pipe. The county road crew tamped concrete into the holes beneath the pipe where the water had washed under it. Hot melted road asphalt was then poured into the culvert to make a bottom surface in it. The asphalt was carried into the culvert in buckets, and poured against the sides of the pipe about a third of the way up. It would then run down the sides, filling the bottom. Afterward, it was "spread along," and pea gravel thrown upon it, so that it would not spread or run too much. In this way, a bed or floor, 3 to 4 inches deep in the center, was made through the culvert.

516

It further appears that in 1911, the Wigle Pipe Works, at Denver, Colorado, manufactured smooth, steel water pipes, and had asphalt equipment for dipping them. In 1921, the Thompson Manufacturing Company succeeded to its business, and took over the equipment, which consisted of a tank in which asphaltic material was heated until liquid. The practice of dipping was continued with smooth steel pipes, until 1922, when the Thompson Company began using the same equipment for dipping corrugated metal pipes, such as are involved in this suit. The pipe was lowered by a hoist into the asphalt tank and then lifted out of the tank and tilted for a while on a slight angle of less than 30 degrees, permitting the excess asphalt to drain back into the tank. It was then placed on a wide car and allowed to remain there while cooling, with the result that the asphalt coating was considerably thicker on the inside bottom of the pipe, than elsewhere; and in many cases, the corrugations on the inside bottom of the culvert were completely filled, even to the point where they were not visible. The asphaltic material used was "Sarco," a product made by an air-blown process, which rendered it tougher, more tenacious, and more adaptable to changes in temperature than other asphalts. It was the same composition as that subsequently adopted by appellant, when it began to make culverts under its patents. According to the testimony of the chief engineer of the Thompson Company, "irrigation water is usually active on materials, soil that is found in an irrigation country is usually active on metal materials." The dipping of corrugated metal culverts in the "Sarco" asphalt by the Thompson Company was for the purpose of protecting the metal "from the action of the elements, the action of water, erosion, corrosion, and the other forms of destruction of nature that might attack it."

The process claimed was obvious, known, and had been used. The Thompson Company had dipped culverts in asphalt and, after lifting them out of a tank, had tilted them at an angle for a longer period than appellant, so that the corrugations would not retain so much of the molten asphalt. Certainly, it was plain that if that company had wanted the asphalt to remain in the corrugations, thus leveling them off, it would have simply tilted the culverts less—or for a shorter period—to drain them, and then allowed them to remain in a horizontal position until the substance solidified. It was clear that the more the pipes were tilted, or the longer the period of tilting, the more asphalt drained back into the 'tank; and it must be supposed that, because the Thompson Company, for reasons of additional weight or expense, did not wish so much of the molten asphalt to be retained in the pools of the corrugations, it merely drained them to a greater extent than appellant, by the same draining method as subsequently used by appellant. In fact, it appears that the Thompson Company, in the course of its operations, revamped its equipment with temperature controls, because of the fact that it was using too much asphalt and getting too thick a coating in the pipes. The asphalt is expensive, and it is for this reason that appellant states, "We merely place it in the bottom where the pipe receives the wear, where it seems to be needed."

The idea of tilting the culverts less, or for a briefer period, than that practiced by the Thompson Company, in order to retain more asphalt between the corrugations, cannot be said to result in invention. The district court found that the process patent employed only the well-known characteristic of liquids to seek their lowest level, in the filling of the hollows or corrugations along the bottom of a corrugated metal culvert, held in a horizontal position; and that the process, in all its essentials, had previously been used in the instance mentioned in California, in 1920. There was substantial evidence to sustain the trial court's findings; and we agree with them, and with the conclusion that the process claims lacked patentable invention.

In considering the product patent, it appears that there was nothing new in placing bitumen or asphalt in the interior of a corrugated metal culvert. Its properties were well known. It was softer than metal, or than the abrasive substances that flowed through the culvert; it was adhesive, and would adhere to the interior of the culvert; it was resilient and yielded so as to expand and contract with the expansions, contractions, and deflections of the metal; and it resisted erosion and abrasion. All of this had been previously known, and corrugated metal culverts, for many years before appellant's patents, had been dipped in bitumen, to take advantage

of these properties. In fact, the identical asphalt composition had been previously used for these very purposes.

We come, then, to the difference between a coating within the base of a corrugated metal culvert, which leaves a surface of asphalt following the corrugations, as disclosed in the Thompson method, and a coating of sufficient thickness to level off the corrugations, leaving a floor free of depressions, as described in the patent. The advantage of one type over the other, resides in the quality of resistance to erosion. But, in this case, erosion might be considered to be either one of two processes: the wearing away, through the gouging or cutting action of the sharp edges of small particles, resulting from the "churning about of the particles of abrasive matter, pebbles, sand, and the like, which tends to scour off the galvanized coating," as set forth in the patent; or the wearing away, or tearing of a surface by the impact of heavy objects, such as large pieces of rock. It is clear that the latter type of erosion—if, within the parlance adopted by the patentee, it could be called erosion—is not the same scouring which results from a churning about of particles of abrasive matter, and was not the kind of erosion sought to be remedied by the patent. Large chunks of rock would not "churn" between the depressions of the corrugated metal and would not erode in an eddying movement. Such action of rocks on the culvert is rather what would ordinarily be thought of as wear, caused by rough, heavy objects sliding or tumbling through a pipe.

If, then, the patent were confined to remedying the erosion of a metal surface caused by the churning of particles of abrasive material passing over corrugations, it would appear, from the evidence, that an asphalt coating, which did not fill in and level off the corrugations, would fulfill that function as well as that which left a surface free of depressions; for it is the asphalt that causes the rolling movement of the particles, and the fact that the asphalt covering is corrugated, does not change the rolling of the particles to a gliding movement. Both corrugated and level asphalt surfaces, it appears, would cause the particles to roll rather than glide, thus eliminating the cutting and gouging action mentioned in the patent. There is no evidence that such abrasive particles would churn in asphalt-covered depressions in the same manner and with the effect described in the patent, as in the case of zinc-coated metal corrugations; and it is not clear that, in the eddies formed thereby, the movement of the particles would result in the cutting away of the asphalt covering.

Though it is not certain, it may have been that an attempt was made by appellant to show, by testimony, that abrasive particles have an eroding effect upon the asphalt covering the corrugations where the corrugations have not been leveled off by filling the depressions. There was some evidence to the effect that when a particle hits a corrugation, it has the tendency to take off the surface of any protective coating that might be there, *if such a coating is soft enough to "abrade off,"* or hard enough to chip off, and that this depends upon the size and roughness of the particle. But it was claimed by the patentee that one of the chief qualities of the asphalt used by him was that it was of "such toughness as will resist the abrasive action of sand, pebbles, and the like." Further, it was stated that the tendency of particles is to move over corrugations in an undulating, or eddying, form, and "that eddying form is called abrasive and what is called eroding the material." The foregoing is far from proof that the asphalt coating "Sarco," which was used by both the Thompson Company and appellant, would be eroded or "abraded off" the interior of a metal culvert by the churning action of the particles, even if the coating followed the contour of the corrugations; and, from everything before us, the conclusion seems reasonable that, as far as the churning or eddying of particles of abrasive matter is concerned, the Thompson culvert, with a coating of asphalt following the corrugations, is as effective as a culvert in which the asphalt coating fills in the depressions and levels off the corrugated base. It may here be remarked that one of appellant's witnesses, on cross-examination, was asked whether, from the standpoint of erosion, the advantage would not be exactly the same in coating the bottom of a 12-inch uncorrugated iron pipe with asphalt to a point where it leveled off to a depth of 3/16ths of an inch, as it would be if that asphalt coating were used in a corrugated pipe. The answer of appellant's witness was that he did not, off hand, see any great difference between whether the pipe underneath the coating

is corrugated or not corrugated. In the foregoing reply, the witness appears to have been considering the erosion caused by particles of abrasive matter, rather than the damage caused by large objects, such as rocks, passing through the culvert.

The use of asphalt by appellant's patentee, was to "withstand the abrasive action of sand, pebbles, and the like, over a long period of time without wearing away or exhibiting fatigue." But such action, according to appellant's contentions, was due to the fact that abrasive substances would roll over the asphalt instead of gliding, because of the high frictional coefficient. Any similar composition of asphalt in culverts would, therefore, as far as can be found from the record in this case, cause the rolling movement of abrasive particles; and, whether the Thompson Company understood, by its use of asphalt, that it was avoiding the abrasive action, by eliminating the gliding movement of such particles, and their gouging action, for a rolling movement, in which the particles did not gouge, it can be said, in any event, that it realized that an asphalt coating inside a metal culvert would protect it from erosion. That it understood this result of using asphalt, although it may not have appreciated the way in which the erosion was caused, does not entitle a subsequent user of asphalt in culverts, to a patent on the ground that it discovered the minutiae of the process of erosion by abrasive particles.

It appears, then, that the patentee's level floor of asphalt in the bottom of the culvert, was for a purpose other than protecting the metal from erosion caused by particles churning between the corrugations; and that purpose, obviously, was to prevent larger and heavier objects, such as rocks, from tearing off the surface or "eroding" the coating of asphalt. In this connection, it is notable that appellant contends that its patentee was the first to use an asphalt coating to protect a culvert against erosion, as contrasted to corrosion. This is contradicted by the use made by the Thompson Company. Testimony of one of appellant's witnesses, also disclosed that the thin covering of asphalt, following the corrugations and extending up the sides of the culvert above the floor, protects the side of the pipe "from damage that might be caused by a fairly large-sized stone that may be washed through the pipe." This thin coating on the sides of the culvert, provided in appellant's patent, was the same as the thin coating of the Thompson method. If one would protect against the damage caused by large stones or rocks being washed through the pipe, so would the other; and the use of both methods was to protect against erosion as well as corrosion. If stones or rocks that were washed through the pipe, were larger than the "fairly large-sized stone" mentioned by the witness, and of a size and weight to cause damage to the pipe, the obvious thing to do was to use a greater amount of protective asphalt on the inner surface of the pipe at the point where such damage or wear would take place. That is what appellant did—not, however, for the purpose of protecting against the churning effect of abrasive particles, as emphasized in its patent and in its argument. Beyond "the gross rattle of the foreground," may be perceived a purpose entirely different, not mentioned in the patent, namely, to protect against and to resist erosion of water-driven rocks, as ultimately suggested on the last page of appellant's reply brief. This is to say that the remedy for damage from heavy stones or rocks, washing or tumbling along the bottom of the culvert, is a thick protective surface, or floor,—and the heavier the rocks, obviously, the thicker would be the protective surface required at the place of wear on the bottom of the culvert.

The district court concluded that the patentee's reason for thickening the asphalt in the bottom of the culvert, was because it was found that the greatest wear occurred there; and that, whatever the improvement, it was only the result of what the skilled workman in the calling would do when faced with the condition to be corrected. The court found that the product patent did not disclose patentable invention in view of the use made of asphalt in culverts by the Thompson Company, and the paving of the Ventura culvert with asphalt and gravel. In view of the prior art, the claims were held to be invalid and lacking patentable invention. Substantial evidence sustained the above-mentioned findings, with which we agree; and the conclusions of law necessarily follow. Other matters discussed by counsel are unnecessary to decision.

The judgment of the district court is affirmed.